REICHERT *v.* AMERICAN STATE SAVINGS BANK.

APPEAL OF BURGESS.

1. BANKS AND BANKING—ESTOPPEL.

One who loaned securities to assistant cashier of bank, gave him key to safety deposit box containing other securities, and power of attorney which was not revoked upon discovery of several acts with respect to securities now alleged to have been unauthorized, nor bank officials apprised of conduct of assistant cashier, but a still broader power of attorney given to him, is estopped to charge bank in receivership for alleged unauthorized acts with respect to securities.

2. SAME—FINDING OF COURT.

In proceeding by receiver of bank against debtor, finding of court that debtor who loaned securities to assistant cashier had full knowledge of alleged unauthorized uses made thereof *held,* sustained by record.

Appeal from Ingham; Carr (Leland W.), J. Submitted October 13, 1933. (Docket No. 91, Calendar No. 37,274.) Decided December 5, 1933.

Receivership proceedings by Rudolph E. Reichert, State banking commissioner, against American State Savings Bank. On intervening petition of Louis F. Burgess for an accounting and set-off. From order dismissing petition, intervener appeals. Affirmed.

*Cummins & Cummins,* for intervener.

*Kelley, Sessions, Warner & Eger (Walter S. Foster,* of counsel), for defendant.

NORTH, J. The American State Savings Bank went into receivership in December, 1931. At that

time Louis F. Burgess owed the bank approximately $65,000. He filed a petition in the receivership proceedings February 4, 1932, alleging that the receiver possessed certain bonds, stock certificates and other negotiable instruments belonging to petitioner, and praying an accounting and set-off against his indebtedness to the bank and for return of his securities except such as are properly held as collateral. From a decree dismissing his petition Mr. Burgess has appealed. We quote in part the carefully prepared and helpful opinion of the circuit judge:

"The facts out of which plaintiff's alleged cause of action arises are somewhat involved. It appears that for some period of time prior to October, 1928, petitioner was on friendly terms with one Robert E. Grissinger who was at the time of the transactions involved in this matter, an assistant cashier of the American State Savings Bank. During the month referred to petitioner offered to loan to Grissinger 800 or 900 shares of the Motor Wheel Corporation in order to permit the purchase of 1,000 shares of stock of the Reo Motor Car Corporation. In accordance with the plan a loan in the amount of $31,500 was negotiated by Grissinger at the bank and there was deposited as collateral, 800 shares of Motor Wheel belonging to petitioner and the Reo stock was purchased by Grissinger. The obvious purpose of the transaction was to enable the latter to make a profit which apparently both he and the petitioner anticipated would be the result of the venture. A receipt was given to petitioner for 900 shares of Motor Wheel stock, providing that it was not to be transferred and that it was to be security for the loan. In December, 1928, the amount of the loan was increased to approximately $36,500, some additional collateral being supplied. Petitioner asserts that he knew nothing of this increase until about two years later.

"In December, 1928, petitioner, who was about to leave the State for the winter season, gave to Grissinger a power of attorney authorizing the latter to handle certain details of petitioner's business and at about the same time petitioner gave to Grissinger a key to the former's safety deposit box, in which box, it is claimed, there were various stocks and bonds. In April, 1929, the Reo Motor Car Company stock above referred to was sold at a loss of approximately $4,000. Petitioner returned to Lansing on the 3d of July, 1929, and then discovered, as he claims, that 500 shares of Motor Wheel stock had been taken by Grissinger and put up as additional collateral for the latter's loan at the bank. Admittedly, petitioner did not apprise the officers of the bank of his claim that this stock was taken without his knowledge and consent. Subsequently he accepted a receipt from Grissinger therefor.

"In the late summer of 1929, petitioner went to Copper Harbor and on his return from that place discovered that all of his securities had been removed from the safety deposit box. He claims that he took the matter up with Grissinger and that the latter told him that a record of the various securities was being prepared. Apparently there was no insistence that the stocks and bonds in question should be returned at once to the safety deposit box and petitioner did not advise the officers of the bank as to what had occurred; neither did he revoke the power of attorney previously given nor require that the securities or the key to the safety deposit box should be returned to him.

"The record discloses that petitioner was engaged to some extent in the buying and selling of stocks and other securities. In December, 1929, his account was transferred to a Detroit brokerage house, Merrill, Lynch & Company. At approximately the same time, the securities that Grissinger had pledged at the bank as collateral for his loan

were sent to the same firm by Grissinger and a loan thereon was obtained in an amount sufficient to discharge the note at the bank. Petitioner insists that he was not aware of this transaction at the time, but it is admitted that in the spring of 1930 he was advised of the situation. It appears that there was then in Grissinger's account, 1,600 shares of Motor Wheel stock, belonging to petitioner, which had been transferred to the name of Merrill, Lynch & Company. The dividend on this stock was credited to the account of Grissinger and was paid by the latter to petitioner.

"In December, 1929, petitioner gave to Grissinger a second power of attorney authorizing the latter to deal with the Merrill, Lynch account of the former and conferring authority of a broad nature. All of the stock certificates in question had been indorsed by petitioner so that no practical difficulty was presented to their use by Grissinger. It appears that the latter negotiated three different loans from other banking institutions, using as collateral therefor securities belonging to petitioner. In December, 1930, Grissinger caused these loans to be paid through the bank and drew a draft in petitioner's name on a brokerage house in Detroit, attaching the securities thereto. This draft was not honored and, with the securities, was returned to the bank. These securities have been retained by the bank and by the receiver as collateral for the amount of the indebtedness evidenced by the draft. Petitioner claims that he did not authorize specifically the drawing of this draft and that he did not know of it until it was dishonored. Shortly thereafter and on or about the 1st of January, 1931, Grissinger's account with Merrill, Lynch & Company (later taken over by E. A. Pierce & Company), which had been carried in his wife's name was closed. The securities therein designated as 400 Motor Wheel and 200 Wizzard, were sent to the defendant bank with draft attached in the sum of

$3,324.17. This draft was paid by the bank and the stock held as security. Subsequently 100 shares of Motor Wheel were sold together with certain bonds and the amount of the account reduced to $881.74.

"The claim of liability on the part of the bank is based on the theory, as set out in the petition, that the officers of the bank were guilty of negligence in connection with the various transactions referred to. It is insisted that the facts are such as to charge the bank with knowledge that Grissinger was using petitioner's securities unlawfully. It is insisted also that the bank, through its officers, had such knowledge of Grissinger's stock dealings as to establish bad faith on the part of the bank in retaining him in its employ.

"The petition alleges that Grissinger had been guilty of dishonest and fraudulent conduct and had been short in his account with the bank. There is, however, no proof to support any such claim. It is conceded that the president and vice-president of the bank knew that Grissinger was dealing in stocks but it does not appear that either of said officials knew of the extent of the dealings nor that they were aware at the time of the loans made by Grissinger at other banks for which securities belonging to petitioner were pledged as collateral. * * * Petitioner did not himself deposit any collateral with the bank but rather turned it over to Grissinger, thus allowing the latter to handle it. If the latter was guilty of unauthorized acts the conclusion is unavoidable that petitioner, by his course of conduct, made the same possible.

"Irrespective of the knowledge of the bank's officials with reference to Grissinger's activities in buying and selling stocks, it is not disputed that petitioner was fully informed in that regard. His failure to advise the bank of acts on the part of Grissinger that are now claimed to have been fraudulent is unexplained. The conclusion is unavoidable that notwithstanding his actual knowl-

edge, he still had confidence in Grissinger and was willing to trust him with the key to his safety deposit box and with the securities taken therefrom. The power of attorney executed in December, 1928, was not revoked until January, 1931. Petitioner must have been aware that the securities that he says were taken from his box prior to September, 1929, were not restored, for the record of the bank conclusively establishes that at various times during the latter part of 1929 and during the year 1930, petitioner had access to his box. Nevertheless he elected to continue his course of dealing with Grissinger and to withhold from the bank officials his knowledge of specific facts that he now urges as the basis of his right to recover.

"Without discussing the matter in further detail, I am brought to the conclusion that petitioner is now estopped because of his affirmative acts and his own negligence in asserting liability on the part of the receiver. An order will enter dismissing the petition."

After careful consideration of the record we are fully satisfied it sustains the circuit judge who held that Mr. Burgess by his own course of conduct is estopped from securing the relief which he seeks in this equity proceeding. In arriving at this conclusion we are mindful of appellant's contention that he did not know of or authorize the sale of the Reo stock (April 3, 1929), nor did he have knowledge of the increase of the bank loan to Grissinger (December 28, 1928), and therefore his subsequent conduct incident to the subject-matter of this litigation, in the absence of such knowledge, should not work an estoppel. While there is conflict of testimony, our view of the record is that Mr. Burgess had full knowledge of the sale of the Reo stock. There is direct and positive testimony to that effect. If he authorized or knew of the sale, a rather

persuasive inference follows that he also knew the amount of the indebtedness incident to which the stock was hypothecated. And it would indeed be rather far-fetched to hold that the increase of the bank loan from $31,500 to approximately $36,000 was an act which (under the existing circumstances) relieved Burgess of the consequences of his later conduct, including giving Grissinger the subsequent (December 17, 1929) power of attorney which authorized him to consummate for Burgess transactions of much more serious consequence than the increase of this loan. This power of attorney was given months after Burgess had full knowledge of certain phases of Grissinger's alleged misconduct in consequence of which Burgess now seeks to fasten liability upon the bank. Subsequent to both the increase of the loan and the sale of the Reo stock, Burgess and Grissinger visited their Detroit broker and there inspected the records and "discussed the account." The broker, a disinterested witness, testified: "I did not hear Mr. Burgess express any disapproval of Mr. Grissinger's handling of his account." This circumstance tends strongly to support Grissinger's testimony that throughout the course of the transactions here involved he and Burgess frequently consulted and the latter had full knowledge of each of such transactions. Considering all the testimony it seems incredible that Burgess did not have full knowledge from time to time of the various transactions in which he and Grissinger were involved, including the enlargement of the bank loan and the subsequent sale of the Reo stock. We are in accord with the decree entered in the circuit court and it is affirmed, with costs to appellee.

McDonald, C. J., and Weadock, Potter, Sharpe, Fead, Wiest, and Butzel, JJ., concurred.